399 So.2d 646 (1981)
Lana J. HINGLE, Administratrix,
v.
PLAQUEMINES OIL SALES CORPORATION, Eugene C. Nunez and Eugene E. Leon, Jr.
No. 11811.
Court of Appeal of Louisiana, Fourth Circuit.
May 22, 1981.
Writ Denied June 22, 1981.
Greenberg & Dallam, Nathan Greenberg, Gretna, for plaintiff-appellant.
Butler & Reynolds, Peter J. Butler and Gayle A. Reynolds, New Orleans, for defendants-appellees.
Before SAMUEL and GARRISON, JJ., and BAILES, J. Pro Tem.
JULIAN E. BAILES, Judge Pro Tem.
The plaintiff-appellant, Lana J. Hingle, as administratrix of the Succession of Joseph P. Hingle, Jr., sought an injunction against the action of the Board of Directors of Plaquemine Oil Sales Corporation, its president, Eugene C. Nunez, and Eugene E. Leon, Jr., its secretary-treasurer, to prevent the implementation of certain annual salary increases to Eugene C. Nunez in his capacity as chief executive officer of the corporation. Certain other action was stated as a cause of action for the institution of this suit; however, such is not at issue in this appeal. After hearing on the rule nisi, the trial court refused to enjoin the salary increase action of the defendants. From this adverse ruling of the trial court the plaintiff has timely appealed.
A brief resume of the recent history of this closely held corporation and the employment of Mr. Eugene C. Nunez is desirable for a better understanding of the issue and its resolution. At the present time the stock of the defendant corporation is owned by the following individuals in the indicated percentages: Succession of Joseph P. Hingle, *647 50 percent; Eugene C. Nunez, 25 percent; and Eugene E. Leon, Jr., 25 percent. The plaintiff, as administratrix of her father's succession is a member of the board of directors, as are both Nunez and Leon. These three persons comprise the entire board of directors. In 1952 Mr. Nunez went to work for Shell Oil Company as a budget analyst. This employment continued for the next twenty years, during which period he progressed from his initial position to assistant manager of the whole of Shell's activities in the States of Alabama, Mississippi, Tennessee and Arkansas. At the termination of his employment with Shell he was earning $37,500.00, plus a large framework of fringe benefits which monetarily greatly augmented his stated remuneration.
Mr. Nunez voluntarily severed his Shell connection to join Plaquemine Oil Sales Corporation on May 1, 1972. At the close of this corporation's fiscal year on April 30, 1972 it had an audited loss in excess of $8,500.00. At this time, in addition to Mr. Joseph P. Hingle, who was the owner of 50 percent, there were two other stockholders who owned the other 50 percent of the stock. It was from the latter two individuals that Mr. Nunez purchased his 25 percent and Eugene E. Leon, Jr. purchased the other 25 percent.
It is sufficient to state that with Mr. Nunez as the chief administrative officer alone in charge of sales, personnel, and purchasing brought the corporation from an $8,000 loss in 1972 to the point of earning a net profit in excess of $1,500,000 for the first nine months of the 1979-1980 fiscal year.
The issues on this appeal are: (1) The determination of whether the increase in annual salary of defendant-appellee Nunez, as president and chief administrative officer, to the $100,000 and $125,000 level is excessive; and (2) The propriety of the unilateral raise in salary by Nunez himself and his participation in the vote of the board of directors which authorized the raises.
At trial both the plaintiff and the defendants presented one expert witness each. Both witnesses appeared knowledgeable of the subject at hand. We believe it of value to quote the salient testimony of each witness.
Mr. Robert Peel, the plaintiff's expert, testified as follows:
"Q. Assuming that there was a gross salary paid to the President and Chief Executive Officer of seventy-two thousand dollars for the year 1978, would you please tell us, sir, whether you would consider the increase from 1978 to 1979 to ninety-three thousand dollars plus the fifteen hundred dollars to I.R.A. to be reasonable or unreasonable?
"A. Well, based on the data from the income statement and the data from the salary survey which reflects salary for the year immediately preceding the time we're talking about, in my estimation the salary increase would be unreasonable, and I'll explain how I came to that conclusion. In terms of executive compensation, you generally are measuring a man's performance. I think that's conceded to be true. The executive's job description is very difficult to quantify. In determining that salary, you would tend to look at what his track record has been. You would tend to look at the recent past and a little more distant past. Based upon those sort of criteria, you would make a decision as to whether or not he was entitled to an increase. Prior to that time, you would test the market to determine whether or not his current salary level was commensurate with his position and constant with the salary market at that time. The survey that I utilized was the American Management Association Executive Compensation Survey, which is conceded by a great number of people in the industry to be the most credible executive salary survey in existence. They have for some thirty-one years provided that *648 information to corporations. It has a section of petroleum crude oil and natural gas, which reports salaries of executives in organizations in that particular segment of the industry. Based on that data, there is an indication that the seventy-two thousand dollars would be a reasonable salary. This was published in October, and it was data as of July, 1978. They indicated that for organizations with average sales of thirteen million, four hundred and five thousand dollars that a reasonable salary for the Chief Executive Officer would be seven thousand, four hundred dollars. If you look at the data, you notice as the sales volume increases or decreases, there's a somewhat direct relationship in that salary. I would say in my estimation that an organization with a sales volume of four or five million dollars could expect to reasonably pay in the neighborhood of seventy-two thousand dollars for a Chief Executive based on this data.
"Q. Mr. Peel, in connection with that raise to the sum of one hundred thousand dollars, would you consider that to be reasonable, unreasonable, and if so, why?
"A. I think the initial raise from the seventy-two thousand dollars represented a substantial percentage increase in terms of what the relationship of profit to sales had been, in terms of what the track record had been, in terms of what the cost containment had been because they had increased in all of those areas from '74 to '79. In light of the fact that there had been one raise immediately prior to that or within six months prior to that, I would tend to think it was unreasonable.
"Q. Let's take it one step further and get to the nitty-gritty of what what we're really at issue with here today. The subsequent raise in December of 1979 to $125,000.00 per annum plus the bonus of $12,500.00, which was voted on at that time, tell us your opinion as to that and why.
"A. Looking at the $125,000.00 raise and looking at the sales volume of that corporation, I would tend to think that the man is overpaid. He's overpaid because that sort of salary level is indicative of a sales data group of 25 to 50 million dollars in terms of the data, and it's the only objective data or some of it available. That represents a sales group of 25 to 50 million dollars."
Mr. Gerard E. Watzke, the defendants' expert, gave the following testimony:
"Q. Have you attempted to apply your criteria for establishing a compensation package to Mr. Nunez's particular situation?
"A. Yes, I have.
"Q. What have you concluded:
"A. My conclusion is that the reasonableness of Mr. Nunez's salary, in my judgment, is beyond question. How I got to it is like this. In terms of what an executive search firm would doWell, they would look at the market value of the executive. In the case of Mr. Nunez, there is no obvious way determining market value because he hasn't been seeking a job in the open market and has no letter of offer which says that in the open market he is worth this much. So we have to look to other data, which could be his history. That's the most obvious one anyhow. For this I looked at the compensation which was being provided to Mr. Nunez as an employee of Shell Oil immediately prior to his joining Plaquemines Oil Sales Corporation. I noted in 1971 his salary was $37,500.00. If one adds on to thisIn my judgment, a company such as ShellWell, I know something of Shell's compensation policies because I worked for them in summers and so forth as an engineer *649 some years ago. Anyhow, I would think a reasonable figure to tack onto that would be about 40 percent, but surveys will differ with this depending upon the industry and the company within the industry. Shell happens to be one of the better employers in this regard. If one looks at that and assumes no promotion and no bonus with a modest 10 percent in salary a year, by 1980 he would be making $124,000.00. In reviewing the accompanying data, Plaquemines Oil Sales Corporation data, for the first time the compensation will equal the Shell compensation, for the first time. There's substantial differences in fringe benefits and the tax implications of not having the benefits, but the Plaquemines salary now is about equivalent to what he would be making with Shell under the assumptions I stated. Although that parity may be present now, we're looking at a $191,000.00 loss by 1980 as a result of Mr. Nunez's employment with Plaquemines Oil Sales because he has foregone during this period that amount of compensation by virtue of his employment with Plaquemines Oil Sales. You must put it in the context of the business itself, Plaquemines Oil Sales. My notions of the success of the business are relatively simple. I look at the state of the business when Mr. Nunez became employed and the state of the business today. I note that if one uses as a cut point fiscal year 1979Well, we heard that in the nine months following that there had been substantial increase in all the figures. Sales increased some two and a half times. Expenses increased about 2.1 times. Stockholders equity, which has not been discussed here, increased about five times. If one uses the updated data, the six-month data as opposed to the nine-month data, for the fiscal 1980, sales is increasing by five times and expenses by three times and Stockholders' equity some twenty times. If you take a five-year average, on the return of assets we're looking at a figure of 24 percent. I view this as an outstanding success. If one looks at the historical relationship within this business, the accounting data, one finds for the period of 1975 to '79, for example, that Mr. Nunez's compensation was something like 1.4 to 1.5 percent of sales. If one applies that historical relationship to the sales figure that we see evolving for 1980, we're looking at a compensation package that should be worth one hundred and fifty or one hundred and sixty thousand dollars. If we look at the expenses, we get the same kind of thing. Given the relationship of Mr. Nunez's salary to expenses, the compensation of $123,000.00 would be my exact figure. I look at the success of the business, the performance, which we have over that long a period to believe that the quantitative part of the criteria are certainly satisfied. In using these sort of data, one must recognize that a compensation cannot be viewed merely as a compensation for performance at that instance. If you look at the condition under which Mr. Nunez joined the company and the extremely low salaries that he drew in the early years as he was attempting, by his testimony, to turn the company around, my conclusion was he was substantially underpaid for those years. The rough validation of that would be to look at the earnings stream had he stayed with Shell. The qualitative aspects of making this kind of judgment would devolve on the skills demanded by this kind of position. As I understand it, he was handling all managerial aspects of the company; financing, delivery, personnel, external relations. I gather in all of these *650 things that Mr. Nunez is the sole decision maker, so the interrelated necessity of these activities suggest he performs a much more complex type of work with Plaquemines Oil Sales than he was performing with Shell, for which his compensation was as we have it. The last bit of qualitative input I used would be the leadership role Mr. Nunez has taken in his professional organizations. In a school of business administration, we constantly teach that to be a successful executive today, you must get outside the firm and work with the external environment. We preach that from morning till night. I need not repeat Mr. Nunez's testimony of his roles in dealing with the external environment. It's the kind of leadership which we can't place an exact dollar value on. I apply basically an earnings pattern against the success of the business. I want to emphasize that this company has done very, very well by anyone's standards, Fortune 500, anyone. I added on these qualifying factors to reach my judgment."
The events which precipitated this action are the following: Mr. Nunez unilaterally raised his salary to $100,000 in May, 1979. Then the board of directors, at its meeting on July 2, 1979, approved the raise. At a December, 1979 board of directors meeting the salary was again raised; this time to $125,000, plus a bonus of $12,500.
The trial court in its reasons for judgment denying the injunction stated:
"This Court feels that the increase in salary is rather dramatic. However, plaintiff has not discharged her burden of proof to convince the Court that it is so excessive that relief must be granted."
It is obvious that the trial judge was more impressed with the testimony of the defendants' expert and the conclusion arrived therefrom than that of the plaintiff's expert.
Our review of appeals extends to law and facts. The standard of appellate review is well prescribed by the Supreme Court in the case of Canter v. Koehring Company, 283 So.2d 716 (La.1973).
In Arceneaux v. Domingue, 365 So.2d 1330 (La.1979) the court, in defining the term "manifestly erroneous", stated on page 1333:

* * * * * *
"As an aid to the exercise of the appellate function of review of facts in civil cases, we attempted to explain, in Canter v. Keohring, supra, without great detail, the appropriate standard. We said that `even though the appellate court may feel that its own evaluations and inferences are as reasonable,' it should not disturb reasonable findings of the trial court when there is conflict in the testimony. We prefaced this observation: `When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error.' 283 So.2d 716, 724. (Emphasis added).
"We did not foresee that this explanation would be misunderstood to mean that: `There is no manifest error when the evidence before the trier of fact furnishes a reasonable basis for its finding.' We said the appellate court should not disturb the factual finding in the absence of manifest error. The difference is important. `Manifestly erroneous,' in its simplest terms, means `clearly wrong.' We said then, that the appellate court should not disturb such a finding of fact unless it is clearly wrong. Therefore, the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous)."
Guided by these precepts of judicial review we find that the judgment of the trial court is not manifestly erroneous because *651 its finding is not clearly wrong. Therefore, even if we were to disagree with the trial court, proper judicial review makes it impermissible for this court to reverse.
We now pass to the second issue, namely: The propriety of appellee, Mr. Eugene C. Nunez, participating in the vote of the board of directors which authorized his subject pay raises.
R.S. 12:84, in extract, is here quoted:
"No contract or transaction between a corporation and one * * * of its directors or officers * * * in which one * * * of its directors or officers * * * has a financial interest, shall be void or voidable solely for this reason * * * or solely because his * * * votes were counted for such purpose, if:

* * * * * *
"(3) The contract or transaction was fair as to the corporation as of the time it was authorized * * *."
Thus, it having been determined that the contract or transaction, namely, the raising of Mr. Nunez's salary from $93,000 to $100,000, then to $125,000, was fair as to the corporation as of the time it was authorized, there is no ground for the disqualification of Mr. Nunez as a voting member of the board of directors. See McCann v. Baton Rouge Millwork, Inc., 386 So.2d 763 (La.App. 1st Cir. 1973); writ refused.
For the foregoing reasons, the judgment appealed is affirmed at appellant's cost.
AFFIRMED.